DOMENGEAUX, Judge.
This is a suit brought by plaintiff, John L. Stracener, for individual damages and for damages accruing to his minor child, Jerry Lewis Stracener. The suit is against defendant, Dr. E. R. Brown, M. D., a general practitioner, for alleged malpractice on the part of the doctor in the treatment of Jerry Lewis Stracener.[1] It is alleged generally that Doctor Brown failed to give plaintiff’s baby the proper medical attention and treatment after birth, which omission was the cause of the child’s mental and motor retardation.
The case was tried before a jury, and a verdict was rendered in favor of defendant, and plaintiff’s suit was ordered dismissed at his costs. Plaintiff has appealed. We affirm.
Essie Mae Stracener, age 41 years, became pregnant for the twelfth time. In due course she went to the DeRidder Clinic in DeRidder, Beauregard Parish, Louisiana, and became the patient of Doctor Brown. Her pregnancy was confirmed and it was determined that she was a diabetic.
DeRidder Clinic is a medical corporation composed of three doctors, Doctor Carter, Doctor Sauls, and the defendant, Dr. E. R. Brown. Based on the procedure used by the DeRidder Clinic, she was seen on occasions by all three of these physicians. Due to the known incompatibility of the Rh factor between her husband and her, plus the new finding of diabetes, she was seen often and admittedly was given proper prenatal care.
Due primarily to her condition of diabetes, it was decided that she would be delivered by Caesarean section. Accordingly, on April 9, 1974, at which time she was considered to be 8V2 months pregnant, she was admitted to the Beauregard Hospital in the City of DeRidder for this surgery. However, on the evening of April 9, 1974, she began to show signs of commencing labor, and by the morning of April 10,1974, it was determined that she was ready to deliver naturally. During the morning of April 10, 1974, she was removed from the maternity ward to the labor room and at 12:40 P.M., April 10, 1974, Jerry Lewis Stracener was born with Doctor Brown in attendance.
Doctor Brown drew cord blood and forwarded it to the laboratory of Beauregard Hospital for testing so as to determine whether or not the blood of Jerry Lewis Stracener had any Rh factor incompatibility, and, if so, whether this was causing any problems. At the time the infant was delivered, it had some difficulty in crying and exhibited evidence of being cyanotic, i. e., a blue baby. It was immediately placed in an incubator and was observed very closely for a period of approximately 3V2 hours. By this time the color of the baby had been corrected and, it appeared normal.[2] When *1284 removed, it was cleaned and exhibited to the mother. At that time, Doctor Brown saw no evidence of jaundice.
That evening, at approximately 8:10 P.M., nursery personnel noticed a slight jaundice and Doctor Brown was summoned to Beauregard Hospital. It is the position of Doctor Brown that he went from the nursery to the room of Mrs. Stracener to inform her of the jaundice and to advise her that the baby might have to be taken to another hospital outside of Beauregard Parish where there would be facilities for blood exchange. The testimony of Doctor Brown is that Mr. Stracener was in the room at the time and was advised that the child might have to be taken to Lake Charles, Alexandria, or Shreveport, Louisiana for blood exchange should the necessity therefor arise.
Early in the morning of April 11, 1974, while making his rounds, Doctor Brown noted a marked progression of the jaundice. Shortly thereafter, he received the results of the Coombs test,[3] which was positive and showed that there was the possibility that the child might have a blood factor problem. He then immediately ordered a biliru-bin test which is a more exact test as to the existence of the blood factor problem. Between 10:00 and 10:30 A.M., he received the report of this test, which indicated that there was a possibility that there would be a necessity for a blood exchange. However, the results of this test were such that, at that time, an exchange blood transfusion was not indicated and as is customary he requested that another bilirubin test be scheduled for noon.
At approximately 11:00 A.M. Doctor Brown was called by the hospital and advised that the baby was showing more changes and at a faster rate. The expert testimony indicates that the crucial factor in a situation such as this is a rapidity with which the bilirubin content in the blood increases. In this case the unusual increase in jaundice (indicating bilirubin) alarmed the doctor so that he returned to the hospital, and at that time instructed the nurses to prepare the baby for discharge, dispensing with further tests in view of the emergency situation. He then advised the family that the baby should be taken to Lake Charles Memorial Hospital, Lake Charles, Louisiana, as had been decided by the family. He, in turn, commenced to make arrangements with Dr. Patrick Unkel, a pediatrician in Lake Charles, and during the noon hour, or shortly thereafter, he discussed the matter with Doctor Unkel and placed him on notice that the child was being transported to Lake Charles, Louisiana, for his attention.
During the noon hour, or shortly thereafter, Mr. Stracener came to Doctor Brown’s office and the doctor discussed with him the transfer of the child to Lake Charles. This concluded Doctor Brown’s contact with the child until subsequent to the blood exchanges which were performed later that day in Lake Charles by Doctor Unkel.[4]
There is confusion, and contradictory testimony, as to when the parents were advised by Doctor Brown of the need for the transportation of the child to Lake Charles, what took place in the interim, and the reasons for the delay in getting the child to Lake Charles Memorial Hospital, Lake Charles, Louisiana. The records of Beauregard Hospital show that the baby was discharged to the family at 3:30 P.M. and was taken to Lake Charles by his father. The child was admitted to Lake Charles Memorial Hospital at 5:00 P.M. on the same date that it was discharged from Beauregard Parish Hospital. A bilirubin test was performed at the Lake Charles hospital shortly thereafter and its result indicated the need of a blood exchange. This exchange was performed by Doctor Unkel with considerable difficulty. Subsequently, it was determined that a second exchange was necessary and this was also performed. On April 18, 1974, the bilirubin content of the blood *1285 had stabilized at 19.7 and the child was discharged from the Lake Charles hospital on April 19, 1974.
After the discharge from Lake Charles Memorial Hospital, Doctor Unkel did not see the child until March 27, 1975, at which time he felt there was evidence of brain injury[5] and this conclusion remained through his examination of June 5, 1975, January 26, 1976, and May 18, 1976. Seeking an expression from a specialist more familiar with the type of disability found by him, Doctor Unkel referred the child to the Blue Bird Clinic, Houston, Texas, where the child was examined and tested by Dr. Thomas E. Zion. Doctor Zion specializes in conditions of this type. Doctor Zion rendered the opinion that the child had some brain damage but stated that the extent could not be determined at this early stage of the child’s development.
We find the issues of this case to be:
(1) Were the defendant’s diagnosis of the child’s condition and his subsequent actions untimely so as to amount to negligence?
(2) Was the defendant negligent in failing to make the necessary arrangements in transferring the child to Lake Charles for further treatment?
As a general rule, it is the duty of a doctor to exercise the degree of skill ordinarily employed under similar circumstances by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Meyer v. St. Paul-Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1954).
In this case, there was ample evidence for the jury to conclude that Doctor Brown fulfilled that duty. The doctors from his community, Doctors Carter and Strecker, testified that to the best of their knowledge, Doctor Brown exercised the degree of care and skill ordinarily employed under similar* circumstances by members of his profession in good standing in the De-Ridder, Louisiana, locality. Doctor Zion, the Houston physician, testified that this was a highly unusual case in that the mother had no previous Rh factor problems with her eleven other children, and that the bilirubin content in the baby’s blood rose with unusual rapidity.
Doctor Unkel, the Lake Charles physician who performed the blood exchanges, testified that he would have liked to have seen the child earlier, but also said that he was in no position to state that the baby could have been sent to Lake Charles at an earlier time. Doctor Unkel also testified that a blood exchange is a very dangerous operation to be performed on a small child, and usually a series of bilirubin tests are run before the exchange is performed. However, in this highly unusual case, further tests were dispensed with by Doctor Brown and Doctor Unkel because of the rapidity with which the bilirubin content was rising. Doctor Strecker testified that he would have acted in a similar manner to Doctor Brown in making arrangements for transportation to Lake Charles if he had been the doctor on the case.
Although there is confusion as to who was supposed to make the arrangements to transport the child to Lake Charles, there is ample evidence in the record upon which the jury could base its decision that Doctor Brown acted in accordance with the community standard in making arrangements for the child to be transferred to Lake Charles for further treatment.[6]
It is the concensus of the medical testimony that Doctor Brown diagnosed a possible Rh factor problem in the early stages of Mrs. Stracener’s pregnancy, and handled the problem with the best techniques available. We find no evidence in the record which faults Doctor Brown for any of his *1286 actions in this case. We find no manifest error in the judgment of the district court.
For the above and foregoing reasons we affirm the judgment of the district court, and cast costs against plaintiff-appellant.

AFFIRMED.

. Originally, John L. Stracener was joined by his wife, Essie Mae Stracener, in seeking certain individual damages resulting from the alleged malpractice of Doctor Brown. However, her suit and the personal demands of John L. Stracener were dismissed in the district court and no appeal has been taken therefrom.

. It is admitted that neither the cyanotic condition nor the actions of the defendant in coping with it form any basis for this lawsuit.

. The cord blood test.

. Doctor Brown later saw the baby on two occasions for a cold, bronchitis, and asthma, but before the retardation (discussed later) was discovered. No issue was made of this treatment.

. The technical name of the damage is Kernic-terus. This is a result of hyperbilirubinemia— high levels of bilirubin, a pigment, in the blood. The symptoms of Kernicterus are motor and mental retardation.

. We note here that plaintiff(s) did not file suit against the Beauregard hospital or any of its staff.