h GASKINS, Judge.
The plaintiffs, Elizabeth and Jerry L. Gordon, individually and as administrators of the estate of their minor child, Katherine Gordon, appeal from a trial court judgment in favor of the defendant, Louisiana State University Board of Supervisors, finding that there was no showing that the defendant’s actions in treating their daughter resulted in damage to the child. For the following reasons, we affirm the trial court judgment.
FACTS
In 1987, Elizabeth and Jerry L. Gordon were expecting the first child born of their marriage. Mrs. Gordon was thirty-two years old and had two children from a previous marriage. Due to an Rh isoimmunization problem with the unborn child, Mrs. Gordon was referred by her health care provider to Louisiana State University Medical Center in Shreveport (LSUMC.) On June 24, 1987, Mrs. Gordon was admitted to LSUMC and labor was induced. Mrs. Gordon was approximately thirty-five weeks into the pregnancy. A full term pregnancy is forty weeks.
On June 25, the treating physicians noted that the baby’s heart rate was consistently low. Then the placenta suddenly separated from the uterus, posing an immediate threat to the life of the mother and the child. An emergency caesarean section was performed. The child exhibited signs of asphyxia at birth, but was resuscitated and placed in the neonatal intensive care unit (NICU). Later, the baby was transferred to the regular nursery. The baby, Katherine Gordon, weighed in excess of five pounds at birth. This was considered a normal birth weight.
Over the next few days, the child’s biliru-bin level in her blood became elevated, causing a jaundiced condition. This occurs when antigens in the child’s blood cause the immune system to destroy its own red blood cells in a process called hemolysis. Bilirubin is a by-product of this process and high levels of it are |2toxic. This substance is normally extracted from the blood by the liver. In newborns, the liver is often not yet mature enough to perform this function efficiently. If levels of this substance become too high, it can pass between the blood-brain barrier and cause damage to the nervous system, including brain damage. This condition is known as bilirubin encephalopathy or kernicterus.
The child’s elevated bilirubin level was treated with phototherapy which acts to neutralize the toxic effects of the bilirubin. She was given fluids to flush the bilirubin from her system and was given glycerin suppositories to eliminate excess bilirubin through the stool. She was also given albumin, which binds with the bilirubin and helps prevent it from damaging the brain. These measures failed to reduce the bilirubin level satisfactorily. The child was then given a total of four exchange transfusions in which the baby’s blood was entirely replaced with donor blood. After the fourth blood exchange, it was determined that the child had suffered seizures and hearing loss in both ears.
The plaintiffs contend that LSUMC was negligent in allowing the bilirubin level in the child’s blood to rise to unacceptable levels before beginning the exchange transfusions. These claims were submitted to a medical review panel which failed to timely rule on the allegations. On April 24,1989, the plain *739 tiffs filed suit against LSUMC in the district court, claiming that the hospital and its employees were negligent in treatment of Katherine and that the negligence resulted in the child’s hearing deficit. They claimed damages for past and future medical expenses, disability, loss of earning capacity, pain and suffering and loss of consortium.
The case was tried in October, 1994. On February 28, 1995, the trial court filed reasons for judgment in favor of LSUMC. The trial court noted that Katherine suffered a hearing loss, fine motor control problems, a slight speech | .«¡impediment due to her hearing loss, and according to her parents, dental staining. The court noted that the child wears hearing aids and relies heavily on lip reading.
The court stated that the main issue in this case was whether the blood exchanges were ordered and performed timely within the applicable medical standards in 1987. The trial court found that the delay between the third and fourth blood exchange fell below the applicable standard of medical care. Following the third exchange, the child’s bilirubin level was 11.8 at 2:23 a.m. on June 30. By 5 a.m. the level had risen to 17.5 and rose steadily throughout the day. At 2:07 p.m. on June 30, the bilirubin level was 21.3. A fourth exchange was not commenced until 11:30 p.m. on June 30 when the bilirubin level had risen to 25.5.
However, the court found that the evidence failed to establish that this delay caused any damage or injury to Katherine Gordon. The trial court noted that, according to expert testimony, the child did not exhibit symptoms of bilirubin damage. Therefore, it could not conclude that the delay between the third and fourth exchange was the cause of the child’s hearing loss. Accordingly, the trial court entered judgment in favor of LSUMC, rejecting the plaintiffs’ claims.
On March 20, 1995, the plaintiffs filed a motion for new trial, arguing that the trial court judgment was contrary to the law and evidence. The motion for new trial was denied on April 20,1995. The plaintiffs appealed the trial court judgment.
ARGUMENTS ON APPEAL
The plaintiffs argue that the trial court erred in finding that no causal connection had been established between the high biliru-bin levels and the child’s hearing loss. The plaintiffs contend that the child was normal following birth and exhibited the hearing loss only after the abrupt elevation in bilirubin level. | .¡Because the child appeared to be normal before the elevation in her bilirubin level the plaintiffs contend that the presumption of causation applies. The plaintiffs argue that the trial court erred in discounting expert testimony indicating that the elevation in bilirubin level most probably caused the hearing loss. They also argue that the trial court misconstrued expert testimony in concluding that there was no causation between the bilirubin level and the hearing loss. We find these arguments to be without merit.
LEGAL PRINCIPLES
La.R.S. 9:2794 provides in pertinent part: A In a malpractice action based on the negligence of a physician ... the plaintiff shall have the burden of proving:
(1) ... [WJhere the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.R.S. 9:2794 places upon the medical malpractice plaintiff the burden of proving by a preponderance of the evidence (1) that the doctor’s treatment fell below the standard of care expected of a physician in his medical specialty, and (2) the existence of a causal relationship between the alleged *740 negligent treatment and the injury sustained, White v. McCool, 395 So.2d 774 (La.1981); Coffin v. Louisiana State University Agricultural and Mechanical College, 620 So.2d 1354 (La.App. 2d Cir.1993).
A medical malpractice plaintiff must show that, as a result of the defendant’s negligence, he suffered injuries that would not otherwise have occurred. The plaintiff need not show that the defendant’s conduct was the only |scause of harm, nor must he negate all other possibilities. Rather, he must show by a preponderance of the evidence, or more probably than not, that he suffered the injury because of the defendant’s conduct. Coffin v. Louisiana State University Agricultural and Mechanical College, supra. Where it is as equally plausible that the defendant’s negligence caused the injury as it is that the injury was caused otherwise, the plaintiff fails to prove that, more probably than not, the injury was the result of negligence. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence and judgment. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). A physician is not required to exercise the highest degree of care possible. Rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. The law does not require absolute precision from a physician. A physician’s conduct and professional judgment must be evaluated in terms of the reasonableness under the existing circumstances and should not be viewed in hindsight and in terms of results or in light of subsequent events. Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied 595 So.2d 657 (La.1992).
Expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill and knowledge, or failed to exercise reasonable care and diligence. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
A reviewing court will give great deference to the findings of fact when medical experts express different views, judgments, and opinions on whether the ^standard of care was meet in any given case. The reviewing court must give great weight to the factual conclusions of the trier of fact. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989); Butts v. Cummings, 488 So.2d 1169 (La.App. 2d Cir.1986), writ denied 494 So.2d 327 (La.1986); Iseah v. E.A. Conway Memorial Hospital, supra.[1]
MEDICAL TESTIMONY
It is not disputed that Katherine has a bilateral hearing loss. At issue in this case is whether the defendant’s actions in treating her elevated bilirubin levels caused the hearing loss. Resolution of this issue requires a factual determination which must be based upon the medical evidence and testimony presented at trial. Our review of the record shows that, based upon the conflicting views expressed in the medical testimony, the trial court was not unreasonable in determining that Katherine’s hearing loss was not caused by her elevated bilirubin levels.
Dr. E.B. Robinson, an expert in obstetrics, testified that it was highly unlikely that any *741 birth event caused the child’s neurological problems. He noted that the mother was referred to LSUMC nineteen weeks into the pregnancy, which is somewhat late. Labor was induced at thirty-four to thirty-five weeks into the pregnancy, based upon the feeling that the child was at risk. He also noted that a 17placental abruption occurred which necessitated an emergency caesarean section and that the child was “floppy and blue” at birth. She was resuscitated and appeared normal within ten minutes of her birth. In his opinion, it was highly unlikely that any birth event caused Katherine’s hearing problem.
Dr. Gary Levy was the director of the blood transfusion service at LSUMC when Katherine was born. He also was an instructor of pediatrics at the medical center. Dr. Levy was questioned by the plaintiffs’ counsel regarding an article on bilirubin management published by the American Association of Pediatrics. He stated that the article was authoritative and read portions of it at the request of plaintiffs’ counsel. According to the article, high bilirubin levels can cause cerebral damage, hearing loss, paralysis of upward gaze, and dental dysplasia (staining of teeth). The article also indicated that these factors are very unlikely to occur if the serum bilirubin concentrations are kept below twenty milligrams per deciliter.
Dr. Arun Pramanik was the treating neo-natologist at LSUMC when Katherine was bom. He had also authored articles in medical journals on the management of high bili-rubin levels or hyperbilirubinemia. He testified that there are tables in some medical texts indicating that the bilirubin level for a newborn should never be allowed to go over 20. He also testified that a bilirubin level of 20 is not a hard and fast standard of care. Dr. Pramanik stated that there are no studies that indicate that a bilirubin level of 20 or more automatically causes bilirubin encephalopathy, which is also known as kernicterus.
Dr. Pramanik testified that many other factors come into play in evaluation of biliru-bin levels and in implementing a course of treatment. He noted that blood sampling techniques are imprecise and may not give an accurate representation of the bilirubin level. He also stated that phototherapy is a common form of |8treatment which neutralizes the toxic effect of bilirubin. However, a blood sampling would still show the level of both toxic and nontoxic bilirubin. He noted that an exchange transfusion is a dangerous technique for an infant and should only be undertaken as a last resort.
Dr. Pramanik testified that when Katherine was forty hours old, she seemed to be normal. However on Saturday morning, approximately two days after her birth, her bilirubin level was elevated to 21.4 and she was transferred to the NICU. On June 28, when Katherine was three days old, it was decided to undertake the first exchange transfusion because the bilirubin level was not dropping. Dr. Pramanik did not offer a definitive opinion as to the cause of Katherine’s hearing loss.
Dr. Elizabeth James, an expert in neona-tology, testified by deposition regarding Katherine’s bilirubin management. She did not examine the child. She stated that, in her opinion, all of the exchange transfusions were delayed too long and Katherine’s biliru-bin level was allowed to rise too high. She noted that the clinical signs of bilirubin encephalopathy, or kernicterus, consist of hearing loss which may also be accompanied with movement disorders and upward gaze deficiency. Dr. James stated that she did not think of the symptoms of kernicterus as being an “all-or-nothing phenomenon.” She testified that she could not determine whether Katherine had the classic symptoms of kernicterus without examining her. She also stated that she could not conclusively determine what caused Katherine’s hearing loss, but thought that the elevated bilirubin levels were suspect. Dr. James stated that she thought the hearing loss was more likely related to the management of bilirubin, but could not rule out as a possibility the circumstances of the child’s birth.
19Pr. Jeffrey Maisels, a pediatrician and neonatologist, testified as an expert in the management of hyperbilirubinemia. Dr. Maisels was a member of a committee that drafted practice parameters for the management of hyperbilirubinemia in full term infants. He testified that Katherine’s eondi *742 tion was normal for about two days following her birth. He also stated that when her bilirubin level began to rise, she was treated aggressively and properly with phototherapy, albumin, fluids and glycerin suppositories. He stated that the child’s bilirubin level of 25 before the fourth exchange transfusion may have been a laboratory error and that there was no explanation as to why the level would have become so elevated at that point in time. He testified that when a child is five days old (as Katherine was at the time of the final exchange transfusion) she was less likely to be damaged by a high bilirubin level, due to the maturation of the blood-brain barrier. He also stated that treatment with phototherapy almost instantaneously reduces the proportion of bilirubin that is potentially toxic by almost twenty percent. However, blood tests do not show a differentiation between toxic and nontoxic bilirubin.
Dr. Maisels testified that it is possible that Katherine’s hearing loss was the result of bilirubin damage, but he was not certain that this was the cause of the damage. He stated that there are many other possibilities that could account for the child’s hearing loss. These circumstances included the placental abruption at birth. While he testified that bilirubin is a likely cause of the hearing loss, Katherine does not present the classic picture of bilirubin encephalopathy. He noted that children with bilirubin encephalopathy always have involuntary movements and problems with upward gaze. He noted that in Katherine’s case, she has none of the indicators of bilirubin encephalopathy, other than hearing loss. He also noted that there are studies indicating that one can essentially eliminate | ipbilirubin encephalopathy as a diagnosis if a child does not exhibit involuntary movements.
Dr. Susan Clay, an expert in pediatric neurology, examined Katherine when the child was two years old. She testified that she had not examined the child’s medical records, but a medical history was furnished by the parents. Dr. Clay was told that Katherine was born at seven months gestation, at full term weight. Dr. Clay testified that she was told that Katherine was delivered in an emergency caesarean section. She assumed this was precipitated by a traumatic event such as a placenta abruption or placenta previa. Mrs. Gordon told Dr. Clay that there was an antibody incompatibility between mother and child but Mrs. Gordon stated that this was not an Rh incompatibility. Mrs. Gordon informed Dr. Clay that Katherine experienced seizures, apnea and arrhythmia after her birth. The last seizure occurred when the child was two months old. Dr. Clay was informed of Katherine’s history of elevated bilirubin levels.
Dr. Clay noted that Katherine had a bilateral hearing loss and mild developmental delays, but no abnormal movements and no defect in fine motor skills. She testified that, for a two year old child with a hearing loss, Katherine had a large vocabulary. She stated that Katherine’s hearing loss could have been caused by bilirubin mismanagement or by the circumstances of her birth. However, she felt that if bilirubin elevation was the cause of the hearing loss, other factors would be present and indicative of bilirubin encephalopathy. These factors were notably absent in Katherine’s case. Dr. Clay testified that there are instances in the medical literature in which hearing loss is the result of a depressed birth, such as a placental abruption, where the child is without blood and oxygen for a period of time. She also testified that one symptom of bilirubin encephalopathy is a high sensory hearing loss. However, she also stated that in | none hundred percent of such cases, extrapyramidal motion or involuntary movement is present. Dr. Clay testified that in ninety percent of such cases, there is an upward gaze problem. Dr. Clay testified that Katherine did not have any of these other indicators and stated that Katherine does not suffer from chronic bilirubin encephalopathy. Dr. Clay was questioned extensively regarding her opinion as to the cause of Katherine’s hearing loss. She stated that in her opinion, bilirubin encephalopathy was not the cause of the hearing loss.
DISCUSSION
The plaintiffs argue that because Katherine appeared to be normal following her birth and exhibited hearing loss only after *743 the elevation in bilirubin level, that the presumption of causation applies. The plaintiffs cite Housley v. Cerise, 579 So.2d 973 (La.1990) for the proposition that this presumption applies if, before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of a causal connection between the accident and the disabling condition. In this ease it is not clear that Katherine was normal and healthy prior to the elevation in her bilirubin level. Her birth was precipitated by a placental abruption, a medical emergency necessitating an immediate caesarean section. At birth, she required resuscitation. Although not conclusively shown to be the cause of her damage, several medical experts testifying in this case indicated that these circumstances could have caused the child’s hearing loss.
The plaintiffs argue that the trial court erred in finding that a causal connection was not established between Katherine’s elevated bilirubin and her hearing loss. The plaintiffs also contend that the trial court misconstrued the | ^testimony of Dr. Clay in finding that the high bilirubin level did not cause the child’s hearing loss. These arguments are without merit.
The plaintiffs attack the testimony of Dr. Clay, urging that her opinion was not based upon accurate information and therefore should be discounted. The plaintiffs argue that Dr. Clay did not examine the medical records and did not listen to the testimony of other medical experts who testified at trial. They also argue that she was misinformed about the Rh incompatibility between mother and child and was not accurately apprised of the medical emergency precipitating Katherine’s birth by caesarean section. Our review of the record shows that the plaintiffs furnished an adequate medical history to Dr. Clay. She was informed that Katherine was born by caesarean section due to a medical emergency which she accurately assumed might have been a placental abruption. She was informed that a blood incompatibility existed between mother and child and was informed of Katherine’s history of elevated bilirubin levels following her birth. We find that Dr. Clay was adequately informed of Katherine’s medical history. We also note that Dr. Clay’s evaluation of Katherine’s condition was based upon a physical examination of the child. Therefore, the plaintiffs’ argument that Dr. Clay’s testimony should be discounted is without merit.
The record shows that there were conflicting opinions by the medical experts regarding the cause of Katherine’s hearing loss. Dr. Robinson did not feel that the conditions of the child’s birth were responsible for the hearing loss. Dr. James testified that, although she felt that the elevated bilirubin levels caused the problem, she did not entirely discount the circumstances of Katherine’s birth. Dr. Maisels also was not certain as to the cause of the hearing loss but stated that bilirubin encephalopathy is always accompanied by other factors such as involuntary movements and, to a lesser extent, problems with upward gaze.
| isDr. Clay, the only neurologist to examine Katherine, testified that the child did not have bilirubin encephalopathy. She stated that the bilirubin elevation was not the cause of the child’s hearing loss. Dr. Clay based her opinion on the fact that Katherine did not exhibit involuntary movement along with her hearing loss.
The record shows that the medical experts disagree as to whether Katherine’s hearing loss was caused by her birth circumstances or by bilirubin encephalopathy. The record contains medical testimony to establish that, unless involuntary movements accompany hearing loss, it is not attributable to bilirubin encephalopathy. As stated earlier, a reviewing court gives great deference to the findings of fact when medical experts express different views, judgments and opinions. When there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact will not be disturbed on review even though the appellate court may feel that its own evaluations and inferences are as reasonable. In this case, the trial court was not unreasonable in concluding that the plaintiffs failed to show, by a preponderance of the evidence, that the elevated *744 bilirubin levels caused the hearing loss. The trial court’s finding is not manifestly erroneous or clearly wrong and, accordingly, is affirmed.
CONCLUSION
For the reasons stated above, we affirm the trial court judgment in favor of the defendant, Louisiana State University Board of Supervisors, rejecting the claims of the plaintiffs, Elizabeth and Jerry Gordon, individually and as the administrators of the estate of their minor child, Katherine Gordon. Costs are assessed to the plaintiffs.
AFFIRMED.
BROWN, J., dissents and assigns reasons.

. We note that Butts v. Cummings, supra, deals with a medical malpractice claim arising from damage to a newborn caused by elevated biliru-bin. See also Stracener v. Brown, 345 So.2d 1282 (La.App. 3d Cir.1977).