692 So.2d 499 (1997)
Raymond ALEX, PlaintiffAppellant
v.
DR. X, DefendantAppellee.
No. 96-1196.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1997.
*500 Sera Hearn Russell III, Lafayette, for Raymond Alex.
St. Paul Bourgeois IV, Joel Edward Gooch, Layayette, for Dr. X.
Before DOUCET, C.J., and WOODARD and GREMILLION, JJ.
WOODARD, Judge.
A deceased woman's family brought this wrongful death and survival action against her physician, alleging that the physician committed medical malpractice when she prescribed medication for suspected tuberculosis before the tuberculosis test results had returned. Later, the test results indicated a negative result for tuberculosis. The deceased died shortly thereafter from a severe liver condition. Defendant filed a Motion for Summary Judgment which was granted by the trial court. Plaintiffs appeal the trial court's judgment. We affirm.

FACTS
In early February 1988, Betty Alex went to the Louisiana State Department of Health and Human Resources Public Health Unit where she met with Dr. Felipa B. Diaz, set out as Dr. X in the caption above. During that visit, Mrs. Alex underwent a chest x-ray, which was indicative of tuberculosis. After an examination, Dr. Diaz diagnosed possible tuberculosis and immediately began a regimen *501 of medication for the treatment of tuberculosis. Mrs. Alex was actually given two different medications, PZA and INH, which were to be taken together. In addition, three sputum specimens and cultures were taken for tuberculosis tests.
On February 24, 1988, Mrs. Alex was called back to the clinic at the Public Health Service because of the negative result of the tuberculosis test and abnormal results on her liver function tests. Upon returning to the clinic, she was again x-rayed and had additional specimens taken. In addition, because Dr. Diaz suspected possible sarcoidosis, a condition unrelated to tuberculosis, she referred Mrs. Alex to Dr. Ernest F. Wong, a pulmonary specialist, for a bronchoscopy. The tuberculosis medication was suspended at that time, and Dr. Wong became Mrs. Alex's treating physician. Mrs. Alex died approximately seventeen months later, on July 20, 1989, due to complications concerning her liver, stemming from sarcoidosis.
On July 11, 1990, the plaintiffs filed suit against Dr. Diaz for wrongful death and survival damages due to the demise of Mrs. Alex, the wife and mother of the plaintiffs. The suit was initiated after a medical review panel had been convened and had rendered an opinion on the matter in favor of the defendant. In the suit, the plaintiffs allege that Dr. Diaz was negligent in prescribing anti-tuberculosis medication prior to receiving the results of certain tests that would have contradicted or confirmed her initial findings. The plaintiffs further claim that the medicine, which they allege is highly toxic to the liver, had a negative effect on Mrs. Alex, thereby causing further damage to her liver.
Thereafter, the defendant filed a Motion for Summary Judgment based on the pleadings, depositions, and the medical review panel's opinion. After a hearing on March 25, 1996, the trial court granted the defendant's motion and dismissed the suit. Plaintiffs appeal the trial court's ruling.

ASSIGNMENT OF ERROR
The plaintiffs, in their sole assignment of error, claim that the trial court erred in granting summary judgment in favor of Dr. Diaz, because material issues of fact remain and there are inferences of medical negligence that the jury can draw from the facts.

LAW

SUMMARY JUDGMENT
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Potter v. First Federal Savings & Loan, 615 So.2d 318 (La.1993). A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits submitted, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B). A fact is "material" if its existence potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the relevant legal dispute. Cormier v. Wise, 93-1434 (La.App. 3 Cir. 6/1/94); 638 So.2d 688. A fact is "at issue" if there exists any reasonable doubt as to its existence. Durrosseau v. Century 21 Flavin Realty, 594 So.2d 1036 (La.App. 3 Cir.1992).
The law of this state has always supported the proposition that "[s]ummary judgments are not favored and should be used cautiously and sparingly, and any reasonable doubt should be resolved against the mover." Penton v. Clarkson, 93-657 (La.App. 1 Cir. 3/11/94); 633 So.2d 918, 922 (citations omitted). However, recent changes have occurred in this area as part of the 1996 legislative tort reform package. 1996 La.Sess.Law. Serv. 1st Ex.Sess. Act 9 (S.B.27) (WEST). In the 1996 special session, Act 9 of 1996 amended La.Code Civ.P. art. 966, effective May 1, 1996. Article 966 now states, in pertinent part:
A.(2) The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action.... The procedure is favored and shall be construed to accomplish these ends.
....

*502 C. After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted against an adverse party who fails to make a showing sufficient to establish the existence of proof of an element essential to his claim, action, or defense and on which he will bear the burden of proof at trial.

....
G. Notwithstanding any other provisions of this Article to the contrary, the burden of proof shall remain with the mover.
(Emphasis added).
In the past, any doubt regarding the existence of material facts was to be resolved against granting the summary judgment, even if grave doubts existed as to a party's ability to establish disputed facts at trial. Penton, 633 So.2d 918. The amendment does not change the law regarding burdens of proof, as the mover is still required to prove the absence of a genuine issue and his entitlement to judgment. La.Code Civ.P. art. 966(C) & (G); Short v. Giffin, 96-0361 (La.App. 4 Cir. 8/21/96); 682 So.2d 249; Walter v. Kroop, 96-0618 (La.App. 4 Cir. 7/24/96); 678 So.2d 580. However, it now appears, based on the new language of section (C), that in order to rebut a showing made by the mover of the non-existence of a genuine issue of material fact, the non-moving party will be held to a higher standard of proof, i.e. a non-moving party must sufficiently establish the existence of proof of an essential element of his claim on which he is to bear the burden of proving at trial. La. Code Civ.P. art. 966(C). Furthermore, La. Code Civ.P. art 967 provides, in pertinent part:
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
It is well understood that summary judgment is a procedural rule. See Penalber v. Blount, 550 So.2d 577 (La.1989). Therefore, the amended Article 966 should be applied retroactively to pending motions and cases on appeal, and particularly to the case sub judice. Short, 682 So.2d 249.

STANDARD OF CARE IN MEDICAL MALPRACTICE CASES
The term medical "malpractice" is defined, in pertinent part, in La.R.S. 40:1299.39 as follows:
A. As used in this Part:
....
(4) "Malpractice" means the failure to exercise the reasonable standard of care specified and required by Subsection B of this Section, in the provision of health care, when such failure proximately causes injury to a patient, as provided in Subsection B of this Section.
....
B. (1) The standard of reasonable care specified and required by this Section is as follows: The standard of care specified and required by this Section for licensed physicians and dentists shall be the same as that required to be proven with respect to them under the provisions of R.S. 9:2794.
In order to prove medical malpractice, a plaintiff must satisfy the three-prong test defined in La.R.S. 9:2794:
A. In a malpractice action based on the negligence of a physician ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by *503 physicians, ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
In Gordon v. Louisiana State University Bd. of Sup'rs., 27,966, pp. 4-5 (La.App. 2 Cir. 3/1/96); 669 So.2d 736, 740, writ denied, 96-1038 (La.5/31/96); 674 So.2d 263 (citations omitted), the court elaborated on the plaintiff's burden of proof as follows:
The plaintiff need not show that the defendant's conduct was the only cause of harm, nor must he negate all other possibilities. Rather, he must show by a preponderance of the evidence, or more probably than not, that he suffered the injury because of the defendant's conduct. Where it is as equally plausible that the defendant's negligence caused the injury as it is that the injury was caused otherwise, the plaintiff fails to prove that, more probably than not, the injury was the result of negligence.
Furthermore, as the supreme court stated in Hastings v. Baton Rouge General Hosp., 498 So.2d 713, 720 (La.1986), "[i]t is not necessary [for a plaintiff] to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival."
As La.R.S. 9:2794(A)(1) makes clear, a physician who is not a specialist is to be held to the standard of care exercised by other physicians licensed to practice in this state who are actively practicing in a similar community under similar circumstances. A physician is not required to exercise the highest degree of care possible, rather he must only exercise the degree of skill ordinarily employed by his peers under like circumstances, using reasonable care and his best judgment in performing the skill. Matthews v. La. State University Medical Center in Shreveport, 467 So.2d 1238 (La.App. 2 Cir.1985). In Gibson v. Bossier City General Hosp., 594 So.2d 1332, 1337 (La.App. 2 Cir. 1991), the court recognized that "[a]n unsuccessful course of treatment is not per se an indication of malpractice." Therefore, the law does not require absolute precision. Gordon, 669 So.2d 736. Rather, "[a] physician's conduct and professional judgment must be evaluated in terms of the reasonableness under the existing circumstances and should not be viewed in hindsight and in terms of results or in light of subsequent events." Id. at 740.

ASSIGNMENT OF ERROR NUMBER 1
The plaintiffs claim that the trial court erred in granting summary judgment in favor of Dr. Diaz, because material issues of fact remain and there are inferences of medical negligence that the jury can draw from the facts. After a thorough review of the record, and for the reasons discussed below, we find that the trial judge was correct in granting summary judgment in favor of Dr. Diaz.
At the hearing on the motion for summary judgment, Dr. Diaz claimed that no genuine issue of material fact existed regarding whether she failed to adhere to the requisite standards of reasonable care ordinarily practiced by physicians within the involved medical specialty. In support of her position, and in order to prove that she was entitled to judgment, Dr. Diaz presented to the trial court her own deposition, as well as the depositions of Dr. Wong, Mrs. Alex's treating physician, Dr. Phillip S. Perret, and the medical review panel opinion which concluded that Dr. Diaz did not breach the standard of care. Dr. Diaz is a specialist in internal medicine. Both Drs. Wong and Perret are internists with subspecialties in pulmonary medicine.
In their depositions, both doctors stated unequivocally that Dr. Diaz' actions regarding her treatment of Mrs. Alex fell squarely within the degree of care exercised by physicians who specialize in internal medicine, and was reasonable under the circumstances. Specifically, Dr. Wong testified as follows:

*504 Q. Okay. So, then, the bottom line, Doctor, is that half the time you may start a patient on the TB medication
A. We do it routinely, many time[s].
Q. before youroutinely, before you even get back the positive or negative culture on TB; is that correct?
* * * * * *
A. [W]hat you're trying to do is contain damage, you know ... especially if someone happened to have a lot of young children ... in the family, I start them on TB medication before they leave the door, you know, because this way we reduce the chance of giving it to a child.
Q. And, then, you wait for the culture to come back?
A. Culture or through lung biopsy, like I did in this case. The approachI would say, with very few exceptions, most people suspectclinically, the suspect TB; okay. They would start on TB medications; okay?
Q. And, if a doctor, such as Dr. Diaz, did that, in this case, you wouldn't see anything wrong with that?
A. I see nothing wrong with that. The reason[s] for that are as follows: Once, the irreversible damages from TB medicationsINH, specific[ally] INH, that's the fatal one (1), is you'd only prolong damage if someone's not monitored, take it for a long period of time that [sic] just a couple of weeks or a few weeks; okay? Two, you wait for culture to come back. It doesn't always come back.... Sometimes it takes longer. The other thing is; [in] a study done ... even people with known TB in an open lung biopsyon a culture, the smear only identifies twenty-six percent (26%) of the time. So, waiting for the culture to come back, is notactually, most of the time is not the best thing for the patient.
Q. And, you would prefer to have them on the medication for that short period of time?
A. If I suspect TB in the patient ... I would put them on the TB medication. Many times I start them on it and stop just for the routine. You could check with the health unit. I start most patients on TB [medication] and I withdraw them after four (4) to six (6) weeks when the culture would come back.
In his testimony, Dr. Wong emphasized the reasons for Dr. Diaz' approach to the treatment of Mrs. Alex for suspected tuberculosis. Specifically, Dr. Wong stated that a conclusive diagnosis from a tuberculosis culture could take up to six weeks to procure, may not be accurate, and a delay in treatment could lead to a spread of this highly contagious disease.
Dr. Perret also testified regarding Dr. Diaz' treatment of Mrs. Alex and the standard of care among the internist community. He stated:
Q.... What type of diagnosis was it that Dr. Diaz made that she began treatment of?
A. Well, let's see. I believe that she felt that the patient had the possibility of tuberculosis, and also raised a question of possible sarcoidosis.
Q. Doctor, when you have two (2) conditions such as that, is that what is known as a differential diagnosis?
A. Right.
Q. In your examination of these materials, did you make note of the fact that in Dr. Diaz's initial visit with Mrs. Alex and assessment of her situation that she took x-rays which she felt there were some suspicious findings, as well as observed or received a history of a recent weight loss, and also conducted a skin test?
A. Yes.
Q. Considering those circumstances was her differential diagnosis of suspected tuberculosis versus sarcoidosis a reasonable one under those circumstances?

*505 A. Those would be the two (2) main things that Imain disease processes that I would consider, yes.
* * * * * *
Q. The allegation made is that it would have been proper for [Dr. Diaz] to await results of additional tests ... before begining the anti-tuberculous medication. And my question to you is, in your opinion was it within the standard of practice of an internist for her to begin that medication on her initial visit with Mrs. Alex?
A. Based on the record from what Dr. Diaz found on her initial visit I would haveI would agree with her starting a treatment for presumptive tuberculosis.
* * * * * *
Q. Is there not some responsibility to not only treat the patient for the condition, but to be concerned for persons who might be in contact with that patient?
A. Yes.
* * * * * *
Q. Doctor, in summary, is it within the standard of care of internal medicine to begin a regimen of anti-tuberculous medication when you have factors that indicate presumptive tuberculosis, even though you do not have confirmatory tests conclusively diagnosing that condition?
A. That's right.
Q. And the particular medications prescribed in this case within the realm of internal medicine, are they, in your opinion, the appropriate ones to use under the circumstances?
A. Yes.
* * * * * *
Q. Doctor, when you have medications... do you tend to weigh the unlikelihood of an idiosyncratic reaction against the beneficial effect of the medicine when choosing to administer the medication that would seem appropriate to the condition believed to exist in the patient?
A. Yes. I think I've mentioned before that based on the evidence of her x-rays and what Dr. Diaz found when she initially evaluated the patient, a diagnosis of presumptive tuberculosis was the diagnosis that required the most urgent treatment. And it was appropriatethe medications that she prescribed were the appropriate medications which I would have prescribed at the point at which I would have prescribed them.
Q. And, Doctor, when you say you would have prescribed those medications at that point in time, does that indicate that in your practice as an internal medicine specialist that you would not have treated this lady any different than Dr. Diaz did in that time frame?
A. Right....
Q. And in your years of practice in this community as an internal medicine specialist, is that form of treatment under those circumstances in keeping with the standard of care for your specialty?
A. Yes, as a pulmonary specialist and internal medicine specialist.
As can be seen from the testimony presented, Drs. Wong and Perret were in complete agreement regarding the standard of care for a patient in Mrs. Alex' condition, and Dr. Diaz' adherence to that standard in her treatment of Mrs. Alex. First, Dr. Diaz properly established the degree of care ordinarily exercised by internists under these circumstances, the first element of a medical malpractice claim. See La.R.S. 9:2794(A)(1). Second, and more importantly, Dr. Diaz established that she did not lack knowledge or skill, nor did she fail to use reasonable care and diligence, along with her best judgment in treating Mrs. Alex, the second element of a medical malpractice claim. See Id. at (A)(2). Therefore, Dr. Diaz presented sufficient evidence, through the depositions and medical review panel opinion, that she was entitled to judgment as a matter of law.
As stated above, pursuant to La.Code Civ.P. art. 966(C), in order to rebut the showing made by Dr. Diaz and demonstrate the *506 existence of a genuine issue of material fact, the plaintiffs are required to sufficiently establish the existence of proof of an essential element of their claim on which they are to bear the burden of proving at trial. Short, 682 So.2d 249. Specifically, the plaintiffs must show the existence of proof that Dr. Diaz breached the established standard of care in her treatment of Mrs. Alex. The plaintiffs, however, presented no such evidence. While the plaintiffs were able to establish the applicable standard of care through the testimony of Drs. Wong, Perret and Diaz, thereby satisfying their burden of proof for the first prong of a medical malpractice cause of action, they presented no evidence that would tend to indicate a breach in that standard, the second prong of a medical malpractice cause of action. In fact, the plaintiffs did not present any expert or other testimony or evidence which would indicate that the standard of care was breached in this instance, a showing necessary to refute Dr. Diaz' proof of compliance with the standard, or proof that a genuine issue of material fact remained.
Instead, plaintiffs rely on Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94); 643 So.2d 1228, for the proposition that when a physician commits an obviously careless act, a lay person may be able to infer negligence from the act itself. In Pfiffner, the supreme court stated:
The jurisprudence has also recognized that there are situations in which expert testimony is not necessary. Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence. See Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 719 (La.1986). Failure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary are also examples of obvious negligence which require no expert testimony to demonstrate the physician's fault. See id. at 719-20....
We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794's requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can....
643 So.2d at 1233-34. The plaintiffs reliance on Pfiffner, however, is markedly misplaced based on the facts of this case, as the alleged acts of Dr. Diaz fall far below the obvious careless acts discussed by the supreme court above. Indeed, the issues presented in the case sub judice involve complicated medical matters relating to the effects of particular medications and infectious disease, subjects in which a lay juror would not likely be informed. Therefore, in this case, it was necessary for the plaintiffs to present proof of the existence of some medical expert evidence that Dr. Diaz breached the established standard of care in order to defeat the motion for summary judgment.
Furthermore, as indicated by La.R.S. 9:2794, the plaintiffs are not only required to present proof of the standard of care and that Dr. Diaz violated that standard, but they must also present proof of the third element of a medical malpractice claim; namely, that as a proximate result of the alleged breach in the standard of care, Mrs. Alex's suffered injuries that would not otherwise have been incurred. Even if a jury would be able to infer negligence from the mere act of Dr. Diaz prescribing the medication before receiving the results of the tuberculosis test, the plaintiffs presented no proof that there was a causal connection between Mrs. Alex' death and the medication that Dr. Diaz had prescribed. Pfiffner, 643 So.2d 1228. In other words, the plaintiffs presented no evidence that would tend to prove that the INH medication prescribed by Dr. Diaz aggravated *507 Mrs. Alex' existing liver condition to the point of ultimately causing her death.
The issue of causation, however, was addressed by Dr. Diaz in her motion for summary judgment. In fact, Dr. Diaz argued that there existed a "conclusive absence of proof that Mrs. Alex suffered any injuries from the treatment of Dr. Diaz that would not otherwise have been incurred." Again, support for this contention can be found in the testimony presented in support of the motion. On the subject of causation, Dr. Wong testified as follows:
Q. Do you see anything particularly detrimental in this lady having been started on the TB medication before theany kind of long-term problem that was caused by her being on the TB medication before the results of the liver function tests ran?
A. No.... I don't see it caused any irreversible damages by itself, usually. The trouble with INH ... is, usually, long-term use and having INH hepatitis not picked up.
Q. Okay. With ... Betty Alex, do you think there was any long-term adverse side effects from her having taken the INH?
A. I could say, categorically, no.
* * * * * *
Q. And, the anti-tubercular medicine only causes a problem after it's been taken over a long period of time, not being properly monitored.
A. [I]t could cause problems, but not irreversible problems. You just take a short period of time, you're not going to cause irreversible problems.
Dr. Perret also testified concerning the causation issue, as follows:
Q. With respect to the allegation that the particular tuberculosis medication is highly toxic, what is your opinion with respect to that particular ... description of the medication?
A. I wouldn't characterize the medications as highly toxic. To the contrary, we prescribe that combination of medications routinely for patients that have tuberculosis here in the United States, and also worldwide. And actually, as we see more cases of tuberculosis, some being resistant to various medications, at this point we will initially start with not three (3), but even four (4) medications. So, a combination of medications, and these are the three (3) that would be the initial ones that I would recommend to give a patient who had a diagnosis of presumptive tuberculosis, is standard treatment and is given throughout the world to tens of thousands of people. And there are potential side effects and reactions to the medication, but it's not a highly toxic medication such that one wouldThe usual situation, the usual response is that there is no adverse reaction to it.
Therefore, Dr. Diaz met the requirements for the granting of summary judgment as the plaintiffs failed to rebut her showing with proof of the existence of genuine issues of material issues of fact. The plaintiffs failed to meet their burden pursuant to the requirements of La.Code Civ.P. art. 966. In addition, the plaintiffs failed to present the requisite evidence necessary to sustain a medical malpractice claim under La.R.S. 9:2794.
RELEVANT CASE LAW REGARDING THE GRANTING OF A DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN A MEDICAL MALPRACTICE PROCEEDING
In Richoux v. Tulane Medical Center, 617 So.2d 13 (La.App. 4 Cir.1993), the court upheld the trial court's granting of summary judgment in favor of the defendants in a medical malpractice action. In support of their motion for summary judgment, the defendants presented the following: "[P]laintiff's answers to defendants' interrogatories which did not identify any expert who would testify that defendants breached the applicable standard of care; the opinion of the medical review panel that the evidence did not support a finding that defendants breached the applicable standard of care; and the deposition of [one of the doctors on the panel] in which he reiterated that it was his opinion defendants had not breached the applicable standard of care." Id. at 16-17. In *508 their de novo review, the appellate court concluded that the defendants had met the burden of proving the non-existence of a genuine issue of material fact. In addition, the court recognized that, once the defendants had met their burden, "[t]he burden then shifted to plaintiff to set forth specific facts showing that there was a genuine issue of material fact precluding the granting of summary judgment." Id. at 17 (citations omitted).
However, the plaintiff offered no affidavits based on personal knowledge or depositions which set forth facts that would be admissible in evidence at a trial on the merits, pursuant to the requirements of La.Code Civ.P. art. 967. As such, the plaintiff was resting on the mere allegations of her pleadings, which are not sufficient to defeat a motion for summary judgment or rebut the defendant's showing of the non-existence of any genuine issues of material fact and is prohibited pursuant to article 967. Id. Therefore, the court concluded that at the time the trial court ruled on the motion, the defendants were entitled to judgment as a matter of law.
Similarly, in Fortenberry v. Berthier, 503 So.2d 596 (La.App. 4 Cir.1987), the plaintiffs appealed the granting of a motion for summary judgment in favor of the defendants in a medical malpractice action. Specifically, the plaintiffs alleged that one of the physicians had prescribed a particular medication which led to further injury. In support of their motion for summary judgment, the physicians submitted: an affidavit based on personal knowledge, pursuant to La.Code Civ. P. art. 967, in which they denied ever giving that medication to the patient; the medical review panel opinion, which was favorable to the defendants; an expert opinion offered by the plaintiffs, which was "generally favorable" to the defendants; and evidence that the only experts the plaintiffs intended to call at trial were the members of the medical review panel. Id. at 597. Thus, the plaintiffs presented no evidence to support their suit pursuant to La.R.S. 9:2794. In affirming the lower court's judgment, the court concluded:
When a motion for summary judgment is made and supported as provided by C.C.P. Art. 966, an adverse party may not simply rest on the allegations or denials in his pleadings. He must, in his response by affidavits or otherwise, set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. Henderson v. Administrators of Tulane University, 426 So.2d 291 (La.App. 4th Cir.1983), writ denied, 433 So.2d 160 (La.1983). Since the [plaintiffs] failed to rebut [the defendants] motion and supporting documentary evidence we conclude that summary judgment was appropriate.
Id. at 598.
These cases are analogous to the case sub judice and should be followed. The plaintiffs in the present case gave no indication of their intention to call someone other than Drs. Wong, Perret, and Diaz in support of their claims. Furthermore, it is unlikely that the plaintiffs intended to call any other expert witnesses in support of their claims as is evidenced by their reliance on Pfiffner, 643 So.2d 1228, which stands for the proposition that expert medical testimony is not required in certain medical malpractice cases. However, since that case is not applicable to the present case and based on the foregoing analysis, we find that the trial court's granting of Dr. Diaz' motion for summary judgment was appropriate.

CONCLUSION
The ruling of the trial court granting summary judgment in favor of Dr. Diaz is affirmed.
AFFIRMED.