701 So.2d 1062 (1997)
Tracey NICOLL
v.
Dr. S.J. LoCOCO.
No. 97-CA-83.
Court of Appeal of Louisiana, Fifth Circuit.
October 28, 1997.
*1063 Richard H. Barker, IV, Barker & Boyer, New Orleans, for Plaintiff/Appellant.
C.T. Williams, Jr., Bruce A. Cranner, Blue Williams, Metairie, for Defendant/Appellee.
Before GOTHARD, CANNELLA and DALEY, JJ.
GOTHARD, Judge.
Plaintiff, Tracey Nicoll, appeals from a judgment rendered in favor of defendant, Dr. S.J. LoCoco, dismissing plaintiff's medical malpractice and spoilation of evidence suit. For the following reasons, we affirm.
On March 27, 1990, Nicoll consulted Dr. LoCoco, an orthopedic surgeon, for treatment of a knee injury. Nicoll reported falling down some stairs and injuring his right knee four days earlier while engaged in his employment. Dr. LoCoco noted moderate effusion of the knee and he removed approximately 60 cc's of blood-tinged fluid from the knee. Dr. LoCoco's initial diagnosis was acute traumatic synovitis of the knee.
Nicoll returned to Dr. LoCoco on April 3, 1990, reporting a popping sound near the medial line of the knee. Nicoll complained of increased pain associated with the popping, but Dr. LoCoco's examination disclosed no effusion or instability. During return visits on April 10, 1990 and April 18, 1990, Dr. LoCoco noted that Nicoll complained of increasing pain, and on the April 18 visit, Dr. LoCoco found restricted movement. Suspecting that Nicoll might have a torn medial meniscus, Dr. LoCoco ordered an MRI scan of the knee.
On April 23, 1990, Nicoll underwent a MRI scan and the radiologist, Dr. Robert Baird, III, issued a report identifying a meniscal tear involving the posterior horn of the medial meniscus. Dr. LoCoco then recommended arthroscopic surgery to correct the suspected torn medial meniscus, and he performed the surgery on May 2, 1990 at East Jefferson General Hospital. During the procedure, Dr. LoCoco noted that the lateral meniscus was frayed which was indicative of degenerative changes. He also noted two tiny Baker's cysts in the posterior medial aspect of the knee. However, he didn't find a tear in the medial meniscus nor did he find a tear in the anterior cruciate ligament. Dr. LoCoco's *1064 post-operative diagnosis was traumatic synovitis.
Subsequently, Dr. LoCoco referred Nicoll to Craig Goodwin for physical therapy, and Nicoll's knee improved in strength and mobility. Thereafter, following a June 27, 1990 visit, Dr. LoCoco discharged Nicoll with no restrictions. At that time, a clinical examination revealed a full range of motion of the knee and no effusion. Additionally, Nicoll did not have any complaints of pain in his knee, and the only problem Dr. LoCoco noted was crepitance in his knee; however, crepitance was also noted in his left knee. Dr. LoCoco advised Nicoll to return if he had any more problems with his knee.
On February 20, 1991, Nicoll sought a second opinion from Dr. Michael Brunet, an orthopedic surgeon at Tulane Medical Center. After reviewing the MRI scan and performing a clinical examination, Dr. Brunet opined that Nicoll had a tear in the medial meniscus and a tear in the anterior cruciate ligament. When Dr. Brunet performed surgery on March 5, 1991, he found a significant tear and flap of the medial meniscus as well as a complete tearing of the anterior cruciate ligament from its femoral attachment. Dr. Brunet trimmed the posterior horn of the medial meniscus and reconstructed the anterior cruciate ligament. Thereafter, Nicoll had an excellent recovery following the second surgery with no more than a 20% permanent disability of the knee.
On March 20, 1991, Nicoll submitted a claim under the Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq. and the panel members unanimously found that Dr. LoCoco did not breach the applicable standard of care. Subsequently, Nicoll filed suit against Dr. LoCoco on June 17, 1992, alleging that he had committed malpractice. Insurance Company of North America filed a petition of intervention on August 3, 1992, alleging payment for workers compensation benefits to Nicoll arising from the knee injury and seeking reimbursement.
Subsequently, Nicoll filed an amended petition asserting a "spoilage of evidence" claim against Dr. LoCoco for destroying the images on a video tape which Dr. LoCoco allegedly made of the May 2, 1990 arthroscopic surgery.
Following a bench trial on the merits, the trial court granted Dr. LoCoco's motion for involuntary dismissal as to the spoilation of evidence claim. The trial court then took the remainder of the case under advisement and later rendered judgment in favor of Dr. LoCoco dismissing Nicoll's case. No reasons for judgment were provided. Nicoll has appealed the judgment raising several assignments of error.[1]

MEDICAL MALPRACTICE
Nicoll asserts that the record supports a finding that Dr. LoCoco breached the applicable standard of care in his treatment of Nicoll. Dr. LoCoco argues that not only did Nicoll not meet his burden of proof but the overwhelming weight of the evidence presented at trial established that Dr. LoCoco performed completely within the applicable standard of care.
LSA-R.S. 9:2794(A) provides that in a medical malpractice action based on the negligence of a physician licensed under LSA-R.S. 37:1261, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along *1065 with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
In Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991), the Louisiana Supreme Court outlined the burden of proof and appellate standard of review as follows:
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La.1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La., 1991); Smith, 523 So.2d at 822; Rosell v. ESCO, 549 So.2d 840 (La.1989); Hastings, 498 So.2d at 720.
The law does not require perfection in medical diagnosis and treatment. On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. Fraser v. Ochsner Foundation Hospital, 94-380 (La.App. 5 Cir. 12/28/94), 648 So.2d 1081, writ denied, 95-0101 (La.3/17/95), 651 So.2d 270.
In order to prove that Dr. LoCoco's treatment fell below the standard of care, Nicoll presented the testimony of Dr. Jack Moshein, as an expert in the field of orthopedic surgery. He testified that in performing the arthroscopic surgery, Dr. LoCoco's treatment fell below the standard of care by not doing a Lochman test[2], by not looking at the anterior cruciate ligament, and by not probing the meniscus.
Dr. LoCoco did testify that he did not perform an inter-operative Lochman test; however, at the time of the surgery, he had no reason to suspect a tear in the anterior cruciate ligament. Furthermore, Dr. LoCoco testified that he did observe the anterior cruciate ligament during the surgery and that when he probed it, the ligament appeared normal. Regarding the meniscus, he testified as follows:
Q. In Tracey Nicoll's case you probed that meniscus.
A. Yes.
Q. You probed the place where the MRI said there was a tear.
A. Yes.
Q. That was the posterior horn of the medial meniscus.
A. We did both menisci.
Q. You probed them thoroughly.
A. Yes.
Q. You tugged at them and pulled at them.
A. Well, you just shove it (the probe) underneath the structure
and pull at it.
Q. Were you able to visualize any tears?
A. No, I wasn't able to visualize any tear.
Q. It looked normal.
A. It looked normal.
Nicoll also presented the testimony of Dr. Charles Aprill, an expert in the field of radiology who reviewed the MRI scan of April 23, 1990 and Dr. Baird's interpretations of it. In testifying regarding his impressions of the scan, he stated that the medial meniscus was grossly abnormal in that "there's a very large tear at the back of that cartilage that extended into the mid-part of the cartilage where it became complex and ... extended *1066 into the anterior ... part of the knee." He stated that there appeared to be a fairly large free fragment of the meniscus that had moved into the middle part of the knee. He also stated that there was a small cyst which had developed at the back of the knee and that such a cyst is frequently associated with tears of the meniscus. Dr. Aprill further testified that the anterior cruciate ligament was almost completely disrupted from its attachment on the femur.
In contrast to Dr. Aprill's testimony, the defense presented the testimony of Dr. Stuart Phillips and Dr. Wilmot Ploger, experts in orthopedics and members of the medical review panel. Dr. Ploger explained that, despite what an MRI may show, the only way to determine conclusively whether an actual tear exists is to operate on the patient and to visualize the structures of the knee. Additionally, Dr. Ploger testified that sometimes a MRI scan will show a tear, but when the suspected tear is viewed from a surgical standpoint, it cannot be visualized.
Furthermore, both Dr. Phillips and Dr. Ploger testified that Dr. LoCoco observed the standard of care of a board certified orthopedic surgeon in the treatment of Nicoll[3] and Dr. LoCoco also testified that he observed the applicable standard of care.
Dr. Brunet performed the second knee surgery and he had no criticisms of Dr. LoCoco's treatment of Nicoll. In particular, Dr. Brunet explained that while it was possible that Nicoll had a partial tear to the anterior cruciate ligament at the time of the May 2, 1990 surgery, Dr. LoCoco would have been "hard-pressed" to diagnosis it. He also stated that it was "not unusual" to be unable to visualize a tear to the meniscus during arthroscopic surgery even though such a tear was reflected on the MRI.
In rendering judgment in favor of Dr. LoCoco, the trial court apparently made a credibility determination in favor of the defense and found that Dr. LoCoco did meet the standard of care in his treatment of Nicoll. The doctors who composed the medical review panel opined that Dr. LoCoco did not breach the applicable standard of care and they testified regarding the appropriate diagnostic importance of a MRI scan. Dr. Brunet had no criticism of Dr. LoCoco's treatment of Nicoll and Dr. LoCoco's testimony contradicted Dr. Moshein's testimony regarding the viewing of the anterior cruciate ligament and probing the meniscus during the arthroscopic surgery.
Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. Martin v. East Jefferson General Hospital, supra. After reviewing the record, we cannot say that the trial court was clearly wrong in finding that Dr. LoCoco met the standard of care in his treatment of Nicoll.

SPOLIATION OF EVIDENCE
Nicoll contends that the trial court erred in granting Dr. LoCoco's motion for involuntary dismissal on the issue of spoliation of the video tape. Specifically, he argues that the record supports a finding that Dr. LoCoco's "defense camp" destroyed the images on the tape. Dr. LoCoco denied making a video tape of the arthroscopic procedure.
Nicoll testified that Dr. LoCoco gave him a video tape of the arthroscopic procedure immediately after the surgery. When Nicoll and his family viewed the tape they described the image on the tape as being cloudy, foggy and blurry. Nicoll subsequently delivered the tape to defense counsel's office. When the tape was returned, Nicoll viewed the tape again and discovered that the cloudy image had been recorded over with an image of another patient's arthroscope of the knee.
Dr. LoCoco denied making a video of the arthroscopic procedure which he performed on Nicoll. He further testified that he has only made one video of an surgical procedure and that was at the request of the patient.
*1067 In granting the involuntary dismissal regarding this issue, the trial court obviously made a credibility determination in favor of Dr. LoCoco. When a factfinder's decision is based on crediting the testimony of one or more witnesses, instead of others, that finding can almost never be clearly wrong or manifestly erroneous. Alello v. Smith, 94-103 (La.App. 5 Cir. 7/26/94), 641 So.2d 664, writ denied, 94-2231 (La.11/18/94), 646 So.2d 382. After reviewing the record, we cannot say that the trial court was clearly wrong in its evaluation of the testimony.
For the foregoing reasons, the trial court's judgment is affirmed.
AFFIRMED.
NOTES
[1] Insurance Company of North America also appealed from the judgment; however, they have abandoned their appeal by failing to file a brief.
[2] Dr. Moshein testified that a Lochman's test is a "sensitive test" for the stability of the anterior cruciate ligament.
[3] The parties stipulated that Dr. Harry Hoerner, the third member of the medical review panel, would have testified the same as Dr. Phillips and Dr. Ploger.