NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-750

ALLIE MAE BRUCE

VERSUS

RAPIDES REGIONAL MEDICAL CENTER, ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 213,023
HONORABLE F. RAE DONALDSON SWENT, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE
**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, J. David Painter, and James T. Genovese, Judges.

AFFIRMED.

Lawrence Wayne Pettiette, Jr.
Pettiette, Armand & Dunkelman
P. O. Box 1786
Shreveport, LA 71166-1786
Telephone:  (318) 221-1800
COUNSEL FOR:
        Defendant/Appellee - Joanna C. Holton, M.D.


Kevin David Alexander
Guerriero & Guerriero
2200 Forsythe Avenue
Monroe, LA 71201
Telephone:  (318) 325-4306
COUNSEL FOR:
        Plaintiff/Appellant - Allie Mae Bruce

THIBODEAUX, Chief Judge.

The plaintiff, Allie Mae Bruce, filed this medical malpractice suit against Rapides Regional Medical Center, Health South Rehabilitation Hospital, and six physicians for treatment provided at the two medical facilities following Mrs. Bruce's motor vehicle accident on November 2, 2000. All providers have been released except for Dr. Joanna Carole Holton, who became Mrs. Bruce's primary care physician on November 5, 2000, three days after the accident.

Mrs. Bruce alleges that Dr. Holton breached the standard of care by failing to find, diagnose, and treat the cervical fracture that Mrs. Bruce sustained in the auto accident.

Following a bench trial, the trial court rendered judgment in favor of Dr. Holton, finding that Mrs. Bruce did not carry her burden of proof. Mrs. Bruce appeals from that judgment. Dr. Holton also reurges her earlier denied exceptions of prescription and res judicata. For the following reasons, we affirm the denial of the exceptions and affirm the judgment in favor of Dr. Holton.

I.

## ISSUES

We must decide:

(1) whether the plaintiff's claims are barred due to res judicata and prescription; and,

(2) whether the trial court erred in concluding that the plaintiff failed to carry her burden of proof in her claim of medical malpractice against the defendant physician.

## FACTS AND PROCEDURAL HISTORY

Mrs. Allie Mae Bruce was seventy-nine years old at the time of the accident on November 2, 2000. She was driving her van and was broadsided on her driver's side by another vehicle traveling almost fifty miles per hour. Mrs. Bruce was taken to Rapides Regional Medical Center in Alexandria, Louisiana. She presented with multiple contusions and abrasions of the face, scalp, neck, chest, left hip, leg and ankle, and left elbow, forearm and wrist. She complained of neck pain, as well as back and left shoulder pain. The emergency room physician, Dr. F. P. Brinkman, ordered x-rays of her cervical spine. Dr. Alfred Mansour, the radiologist, reported degenerative disk space narrowing, normal alignment of the spine, no soft tissue swelling, and no significant foramina narrowing and noted no acute changes on the cervical spine films. Hence, the x-rays were negative for fracture. Mrs. Bruce was, therefore, diagnosed with cervical strain or sprain.

Dr. Wesley Davis became Mrs. Bruce's attending physician, and she was admitted to the hospital on the date of her accident, November 2, 2000. Dr. Davis was also her cardiologist. He reported that she had retarded movement because of pain and tenderness to palpitation of the back of the head and back of the cervical spine. Dr. Davis' impression was multiple contusions, abrasions, and some hematoma with cervical strain. He also noted that she was a diabetic with hypertension and coronary artery disease. Dr. Davis treated Mrs. Bruce conservatively with anti-inflammatory, muscle relaxer, and pain medication. However, Mrs. Bruce continued to have neck and head pain.

On November 5, 2000, Dr. Davis consulted Dr. Holton, a family practice physician, to evaluate Mrs. Bruce's persistent neck and head pain, to determine what

further testing or specialists were needed, to establish care with a primary care physician, and to manage Mrs. Bruce's diabetes and hypertension. Dr. Holton ordered a CT scan of the head to rule out closed head injury but did not order a CT scan of the neck due to the x-rays that were negative for cervical fracture. She changed Mrs. Bruce's pain medication to avoid nausea and developed a plan for managing her diabetes and hypertension. The CT scan of the head was normal, and Dr. Holton continued to treat Mrs. Bruce conservatively with medication, heat packs, and ultrasound to the back of the neck. The Health South Rehabilitation Hospital was contacted on November 7, 2000, and on November 8, Mrs. Bruce was transferred to that facility, which was next to Rapides Regional Hospital. Dr. Holton did not have privileges at Health South, and Mrs. Bruce came under the care of the rehabilitation physician there.

Dr. Vasudeva V. Dhulipala, a physiatrist and rehabilitation medicine physician, examined Mrs. Bruce, was comfortable with the x-rays negative for fracture, and admitted her to Health South. He treated her with heat packs and ultrasound. When Mrs. Bruce failed to improve, and the family expressed serious concerns, Dr. Dhulipala ordered a CT scan of the cervical spine on November 14, 2000. The CT scan revealed rotary subluxation, C1-2, and longitudinal fracture, C2 vertebral body.

On the same day, November 14, 2000, Dr. Troy Michael Vaughn, a neurosurgeon, was consulted regarding the C2 vertebral fracture. He studied the initial x-rays and noted that it was difficult to appreciate any fracture of the C2 vertebral body and that there was normal alignment of the spine. Given his examination and the current CT scan showing the fracture, Dr. Vaughn's impression was a C2 cervical fracture with rotary subluxation and neurologic deficit. He placed

3

Mrs. Bruce in traction that night, which gave her immediate relief. On the following day, November 15, 2000, he performed a surgical fusion with placement of a halo fixator.

On September 19, 2001, Mrs. Bruce filed a claim with the Patients' Compensation Fund (PCF), asserting claims of medical malpractice for misdiagnosis of the cervical fracture against Rapides Regional Medical Center, Health South Rehabilitation Hospital, Doctors Brinkman, Mansour, Davis, and Holton. Mrs. Bruce received the Medical Review Panel's opinion on March 11, 2003, addressing each defendant's care and stating that none of the defendant medical care providers had breached the standard of care. The opinion stated that based upon the original films, "this was an occult, non-displaced fracture which was not discernable." The opinion further stated that there was "no notable soft tissue swelling, the bones were not displaced, the patient suffered from osteoporosis and arthritis, and there was a marked difference between the original films and those taken just before the placement of the halo." Accordingly, all care based upon the diagnosis of cervical sprain rather than fracture was found to be in compliance with the appropriate standard of care.

During the pendency of the medical review proceeding, between September 2001 and March 2003, the panel received a letter from Mrs. Bruce on April 2, 2002, dismissing Dr. Holton from the claim. The panel received another letter from Mrs. Bruce on September 3, 2002, reinstating the claim against Dr. Holton. There is no evidence in the record that the panel responded in any way to these letters. The panel continued to evaluate Dr. Holton's care along with the other defendants' care and rendered their March 2003 opinion as to all defendants.

On May 7, 2003, Mrs. Bruce filed her medical malpractice suit against all care providers in district court. By December 15, 2003, all defendants had been

4

released except for Dr. Holton. In June 2005, in district court, Dr. Holton filed exceptions of prescription and res judicata based upon the letter of dismissal sent by Mrs. Bruce to the Medical Review Panel in April 2002. The exceptions were denied according to the minute entry in the record dated July 25, 2005. At the trial on the merits, Dr. Holton asked that her exceptions be preserved for appeal.

Mrs. Bruce argues that Dr. Holton was required to find and diagnose the cervical fracture before transferring Mrs. Bruce to the rehabilitation facility, which would have resulted in surgery approximately six days earlier and, according to Mrs. Bruce, in less disability thereafter.

III.

## LAW AND DISCUSSION

### Standard of Review

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two tiered test must be applied in order to reverse the findings of the trial court:

(a)    the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and

(b)    the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

*Mart v. Hill*, 505 So.2d 1120 (La.1987).

Even where the appellate court believes its inferences are more reasonable than the fact finders, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's

findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings even if it is convinced that had it been sitting as trier of fact, it would have weighed that evidence differently. *Housley v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts.

**Defendant's Claims of Prescription and Res Judicata**

Dr. Holton has reurged her previously denied exceptions of prescription and res judicata. Since a granting of the exceptions by this court would dispose of Mrs. Bruce's case, we must first address the exceptions before discussing the merits of Mrs. Bruce's claims.

Dr. Holton argues that Mrs. Bruce's letter of April 2, 2002 to the Medical Review Panel dismissed all claims against her and that res judicata barred reinstatement of the suit. Dr. Holton also appears to be arguing that even if the dismissal was not final, prescription had already run when Mrs. Bruce resubmitted her claim against Dr. Holton back to the Medical Review Panel. More specifically, she argues that the interruption of prescription by the PCF claim ended with the dismissal on April 2, 2002, and any reinstatement had to occur within the time remaining on prescription, which was two months by her approximation, or early June 2002. Dr. Holton further argues that because other defendants were voluntarily released by Mrs. Bruce in December 2003, she cannot claim that solidary liability interrupted the running of prescription as to Dr. Holton in June 2002. Under the facts of this case, we disagree. For purposes of clarity, we will first review the time line.

Dr. Holton treated Mrs. Bruce for the injuries complained of from November 5-8, 2000. Mrs. Bruce filed a claim with the PCF on September 19, 2001,

6

naming Dr. Holton and all other providers as defendants. Hence, prescription was suspended a little over ten months after it began to run. The claim with the PCF also suspended prescription until ninety (90) days after the Medical Review Panel provided the parties with its opinion. La.R.S. 40:1299.47 (A)(2)(a).[1] Notwithstanding the alleged dismissal, Mrs. Bruce received the Medical Review Panel opinion regarding each and every medical care provider named, including Dr. Holton, on March 11, 2003. Therefore, prescription was suspended for ninety more days, or until June 9, 2003. On June 9, 2003, the unused portion of the original prescription time, which was approximately fifty days, would resume running, rendering a final prescription date around the end of July, 2003. However, Mrs. Bruce filed her malpractice suit in district court against all providers, including Dr. Holton, on May 7, 2003, while the PCF suspension was still in effect. Accordingly, Mrs. Bruce's suit has not prescribed on its face.

---

[1] Louisiana Revised Statute 40:1299.47(A)(2)(a) provides as follows:

> The filing of the request for a review of a claim shall suspend the time within which suit must be instituted, in accordance with this Part, until ninety days following notification, by certified mail, as provided in Subsection J of this Section, to the claimant or his attorney of the issuance of the opinion by the medical review panel, in the case of those health care providers covered by this Part, or in the case of a health care provider against whom a claim has been filed under the provisions of this Part, but who has not qualified under this Part, until ninety days following notification by certified mail to the claimant or his attorney by the board that the health care provider is not covered by this Part. The filing of a request for review of a claim shall suspend the running of prescription against all joint and solidary obligors, and all joint tortfeasors, including but not limited to health care providers, both qualified and not qualified, to the same extent that prescription is suspended against the party or parties that are the subject of the request for review. Filing a request for review of a malpractice claim as required by this Section with any agency or entity other than the division of administration shall not suspend or interrupt the running of prescription. All requests for review of a malpractice claim identifying additional health care providers shall also be filed with the division of administration.

*See also, Guitreau v. Kucharchuk*, 99-2570 (La. 5/16/00), 763 So.2d 575 (when statutory 90-day period of suspension after decision of medical review panel is completed, plaintiffs in medical malpractice actions are entitled to the remainder of the one-year prescriptive period that was unused at the time their request for a medical review panel was filed); *and see, Townsley v. Brierty,* 97-601 (La.App. 3 Cir. 10/29/97), 702 So.2d 1073 (medical malpractice plaintiff's filing of claim with medical review board suspended prescription on medical malpractice claim, and prescription did not begin to run again until 90 days after plaintiff received medical review panel's opinion).

We turn now to the effect, if any, of the alleged dismissal with prejudice during the pendency of the medical review proceeding. Dr. Holton advised Mrs. Bruce that she did not feel comfortable in continuing to treat Mrs. Bruce as her primary care physician while a claim against the doctor was pending with the Medical Review Panel. Therefore, Mrs. Bruce agreed to dismiss Dr. Holton in exchange for her continuing treatment. Dr. Holton's attorney drafted a letter of dismissal to the panel using Mrs. Bruce's attorney's signature block, as if Mrs. Bruce's attorney had drafted the letter. The letter also included a signature block for Mrs. Bruce. The letter, which was to be sent to Mrs. Bruce's attorney for his signature first, was inadvertently sent directly to Mrs. Bruce. Mrs. Bruce signed the letter of dismissal with prejudice, but her attorney did not. This letter was dated March 13, 2002, and was received by the PCF on April 2, 2002.

Subsequently, Dr. Holton declined to continue to treat Mrs. Bruce in spite of the earlier agreement. Mrs. Bruce then sent another letter to the panel dated September 3, 2002, adding Dr. Holton back as a defendant. The record contains no evidence of any action by the Medical Review Panel regarding the letters of dismissal and reinstatement. The panel continued its assessments of the fault alleged against each of the medical providers, including Dr. Holton, and issued its opinion in March 2003, specifically finding no fault on the part of Dr. Holton or any of the other individually named defendants. Mrs. Bruce's attorney argued, before trial, that the letter of dismissal had no legal effect because he did not sign it, and he also argued that the dismissal was obtained by fraudulent and coercive means.

We find that Mrs. Bruce's suit was not prescribed or barred by res judicata because the alleged dismissal before the Medical Review Panel was not given legal effect; no judgment of dismissal was executed and entered into the record.

While the failure to obtain a judgment of dismissal resolves the issue of prescription in this case, we also note that the last solidary obligor was not voluntarily dismissed until December 15, 2003, after Dr. Holton was added back to the panel review in September 2002 *and* named in the suit filed in district court in May 2003. Accordingly, the following jurisprudence explains why all of Dr. Holton's arguments for prescription must fail.

An interruption of prescription resulting from the proper filing of a suit within the prescriptive period continues as long as the suit is pending. La.Civ.Code art. 3463. A lawsuit remains pending from the moment it is filed until it is *dismissed by judgment of the court*. This is true even if a settlement is reached, a release is executed, an exception of prematurity is granted, or reasons for judgment have been published. If no court-ordered judgment of dismissal is entered into the record, the suit remains pending. A timely filed suit pending against one solidary obligor constitutes the interruption of prescription as to an *alleged* solidary obligor. This is true even if the first obligor is released by the plaintiff after the second obligor is added. *White v. W. Carroll Hosp., Inc.*, 613 So.2d 150 (La.1992); *Hebert v. Doctors Memorial Hospital*, 486 So.2d 717 (La.1986).

In *White,* 613 So.2d 150, the Louisiana Supreme Court discussed its ruling in *Hebert*, 486 So.2d 717, as follows:

> In *Herbert,* plaintiff fell and sustained injuries while a patient at a hospital. In 1976, within a year of her injuries, she filed a malpractice suit against the hospital. In 1982, plaintiff executed a receipt and release in favor of the hospital. In 1983, seven years after the filing of the suit against the hospital, plaintiff added Dr. Morgan as a defendant alleging solidary liability with the hospital. In 1984, the receipt and release was entered into the record of the suit and a judgment was rendered dismissing the hospital. Dr. Morgan filed an exception of prescription arguing that the receipt and release executed in 1982 served to terminate the cause of action against the hospital

9

at that time and thus the suit against him in 1983 was untimely. This court held that the timely filed suit against the hospital was still "pending" in 1983 when Dr. Morgan was added as a defendant despite the execution of the receipt and release in favor of the hospital a year earlier because no final judgment dismissing the suit was filed until 1984. Thus, plaintiff's suit against the hospital, an alleged solidary obligor with Dr. Morgan, was pending until early 1984, three months after plaintiff, by amending petition, added Dr. Morgan. Consequently, prescription was interrupted as to the claim against Dr. Morgan. *Herbert*, 486 So.2d at 725.

In the instant case [*White v. West Carroll Hospital*], the first suit (No. 19,599) was timely filed against West Carroll Hospital, Inc. on January 4, 1988. Morris Management was added on May 11, 1988. An exception of prematurity was filed by the hospital and heard by the trial judge. The trial judge in his written reasons for judgment indicated that the suit was premature and should be dismissed and further stated that "a judgment should be prepared in accordance with the reasons for judgment, submitted to opposing counsel for approval as to form, and submitted to the Court for signing." No judgment was entered into the record.

A final judgment shall be identified as such by appropriate language. When written reasons for the judgment are assigned, they shall be set out in an opinion separate from the judgment. La.Code Civ.P. art. 1918. Where there are only written reasons and no separate signed judgment, there is no final judgment. *Fisher v. Rollins*, 231 La. 252, 91 So.2d 28, 31 (1956); *Bordelon v. Dauzat*, 389 So.2d 820, 822 (La.App. 3d Cir. 1980). Thus, under the reasoning set forth in *Herbert v. Doctors Memorial Hospital*, the claim against the hospital in suit No. 19,599 would still be pending since no signed judgment is contained in the record.

*White*, 613 So.2d at 154-55. The Supreme Court then remanded the *White* case to the

trial court to review the record of the first suit.

Accordingly, since no judgment of dismissal was ever executed in this

case in April 2002, either in the panel proceeding or in district court, there was no

dismissal in effect, and prescription remained suspended.

Moreover, Dr. Holton admits that "technically" there was no judgment of dismissal by the review panel because the PCF "does not issue judgments." This appears to be true. Our research reveals that the PCF dismisses claims under very limited circumstances.

More specifically, La.R.S. 40:1299.47(A)(2)(c), provides as follows:

> An attorney chairman for the medical review panel shall be appointed within one year from the date the request for review of the claim was filed. Upon appointment of the attorney chairman, the parties shall notify the board of the name and address of the attorney chairman. If the board has not received notice of the appointment of an attorney chairman within nine months from the date the request for review of the claim was filed, then the board shall send notice to the parties by certified or registered mail that the claim will be dismissed in ninety days unless an attorney chairman is appointed within one year from the date the request for review of the claim was filed. If the board has not received notice of the appointment of an attorney chairman within one year from the date the request for review of the claim was filed, then the board shall promptly send notice to the parties by certified or registered mail that the claim has been dismissed for failure to appoint an attorney chairman and the parties shall be deemed to have waived the use of the medical review panel. The filing of a request for a medical review panel shall suspend the time within which suit must be filed until ninety days after the claim has been dismissed in accordance with this Section.

Clearly, there has been no such dismissal by the PCF in the present case. Likewise, the statutes reviewed do not provide for dismissals by the attorney-chairman based upon prescription. Rather, the statutes indicate that a dismissal on grounds of prescription is to be issued by the district court. More specifically, La.R.S. 40:1299.47(B)(2)(a) provides:

> A health care provider, against whom a claim has been filed under the provisions of this Part, may raise any exception or defenses available pursuant to R.S. 9:5628 in a court of competent jurisdiction and proper venue at any time without need for completion of the review process by the medical review panel.

11

Based upon the provisions of La.R.S. 9:5628 and La.R.S. 40:1299.47(B)(2)(a), the peremptory exception of prescription is the only exception that a health care provider is allowed to assert during the medical panel review stage of the proceedings. *Perritt v. Dona*, 02-2601 (La. 7/2/03), 849 So.2d 56. Further, the statutes indicate that the district court, not the PCF, must issue the judgment of dismissal. That was not done in the present case. Dr. Holton's exception of prescription was not filed in district court until June 2005, and it was denied the following month.

In the present case, the PCF did not issue a judgment of dismissal while the claim was pending before it, nor did the district court. The Medical Review Panel continued to assess the fault of all defendants, and prescription was suspended as to all defendants during the pendency of the proceeding. Following the opinion of the Medical Review Panel, Mrs. Bruce timely filed suit in district court against all defendants. Dr. Holton's claims of prescription and res judicata have no merit.

**Plaintiff's Burden of Proof in Medical Malpractice**

Mrs. Bruce contends that the trial court erred in concluding, as a matter of fact, that she failed to carry her burden of proof in her malpractice claim against Dr. Holton. In her Reasons for Judgment, the trial judge stated that the plaintiff failed to carry her burden of proof under *Nicoll v. LoCoco,* 97-83 (La.App. 5 Cir. 10/28/97), 701 So.2d 1062. In that case, the court cited *Martin v. East Jefferson Gen. Hosp.*, 582 So.2d 1272, 1277 (La.1991), and La.R.S. 9:2794, which states the plaintiff's burden of proof in sections A(1)-(3) as follows:

> La.R.S. 9:2794. Physicians, dentists, optometrists, and chiropractic physicians; malpractice; burden of proof; jury charge; physician witness expert qualification

12

A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., an optometrist licensed under R.S. 37:1041 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

In *Martin*, 582 So.2d 1272, the Louisiana Supreme Court

explained the burden of proof and appellate standard of review in medical malpractice

cases as follows:

In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; *Smith v. State through DHHR*, 523 So.2d 815, 819 (La.1988); *Hastings v. Baton Rouge General Hospital*, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. *Housley v. Cerise*, 579 So.2d 973

> (La.1991); *Smith*, 523 So.2d at 822; *Rosell v. ESCO*, 549 So.2d 840 (La.1989); *Hastings*, 498 So.2d at 720.

*Id*. at 1276.

Accordingly, in the present case, because Dr. Holton is a family practitioner, Mrs. Bruce has the burden of proving that Dr. Holton's failure to diagnose and treat Mrs. Bruce's cervical fracture is conduct below the ordinary standard of care expected of physicians in her medical field, and that as a result of Dr. Holton's failure to diagnose the fracture by November 8, 2000, Mrs. Bruce suffered injuries that otherwise would not have been incurred.

Mrs. Bruce alleges that the standard of care in any medical situation is to make an appropriate diagnosis and to prescribe appropriate treatment in accordance with the clinical presentation of the patient. She cites no jurisprudence. While this assertion certainly seems logical, we find it an oversimplification, given the multitude of considerations that go into making a medical diagnosis, and it does not track the language in La.R.S. 9:2794, which states the plaintiff's burden of proof.

Our jurisprudence, including *Alex v. Dr. X*, 96-1196 (La.App. 3 Cir. 3/5/97), 692 So.2d 499, holds that physicians, particularly generalists such as Dr. Holton, are not required to exercise the highest possible degree of care. Rather, they must only exercise the degree of skill ordinarily employed by their peers under like circumstances, using reasonable care and their best judgment in performing their medical skills. In *Alex,* where the defendant physician was alleged to have damaged the patient's liver by prescribing anti-tuberculosis medication based upon an x-ray indicating tuberculosis, we affirmed summary judgment in favor of the physician. We followed jurisprudence holding that "[a] physician's conduct and professional judgment must be evaluated [for purposes of a medical malpractice action] in terms of the reasonableness under the existing circumstances and should not be viewed in

14

hindsight and in terms of results or in light of subsequent events." *Id*. at 503 (citations omitted).

In the present case, Mrs. Bruce asserts that she presented with complaints or symptoms of a fractured cervical spine and that Dr. Holton was negligent in failing to diagnose the fracture. Dr. Holton testified that she did not see symptoms of a fracture given the negative cervical x-rays which had already been accepted by the previous physicians, Dr. Mansour, Dr. Brinkman, and Dr. Davis. Dr. Holton further testified that she would expect to see neck pain and neurologic deficits with a cervical fracture, but Mrs. Bruce's main complaint was the severe headache. Therefore, Dr. Holton ordered a CT scan of the head to rule out closed head injury. Finding none, she continued to treat Mrs. Bruce conservatively for cervical strain, while also managing her diabetes and hypertension.

Dr. Holton also testified that she found no boney point tenderness along the cervical spine, that the neck was getting better, and that she attributed the neck pain to spasm from the cervical strain. She further testified that confusion is a sign of neurologic deficit, but Mrs. Bruce was more agitated than confused. Dr. Holton stated that Mrs. Bruce could communicate, call nurses, and feed herself, and that complaints of nausea could be attributed to medication.

Mrs. Bruce's expert, Dr. David Yarbrough, a family practitioner, testified by deposition that Mrs. Bruce had complaints of persistent neck pain and neurologic deficits, including left-sided weakness, that indicated a cervical fracture. He testified that in reviewing the medical records he saw nurses' notes indicating left-sided weakness three times on November 7, 2000. He also stated that Mrs. Bruce had nausea and limited range of motion in her head and neck, which can be a symptom of cervical fracture, as well as the pain in the back of her head. Dr. Yarbrough

15

testified that the elderly have less calcium, that Mrs. Bruce had severe osteoporosis, and that in such instances you cannot see the bone in detail, and a fracture can be easily missed on plain x-rays. He specifically stated that he did not think the fracture was visible on the plain x-ray in this case. Dr. Yarbrough opined that with Mrs. Bruce's complaints of persistent head and neck pain and the neurologic deficits noted, Dr. Holton should have ordered a CT scan of the cervical spine, and that she breached the standard of care in not doing so.

The record contained computer printouts of approximately two hundred entries, made by nurses, identifying everything from the lighting in the room to the location of the telephone, the patient's skin color, pulse, heart rhythms, and medications administered for all of Mrs. Bruce's preexisting conditions as well as the multiple traumas from the auto accident. There were numerous entries identifying back, neck and shoulder pain, and also arm pain. The most prevalent complaint was back and neck pain. An entry on November 5 indicated that the patient was alert, awakened easily, responded appropriately, and no neurologic deficits were noted. Later that day, an entry shows nausea/vomiting, and chronic diabetes as priority two and three concerns respectively. Later on November 5, the patient was again noted to have no neurologic deficits.

In particular, Mrs. Bruce points to nurse's notes on November 7, indicating mild weakness, severe neck and back pain, drowsiness, and falling asleep during conversations. However, there were several entries indicating only left neck and shoulder stiffness and soreness, an alert status, and strong grip in both hands. The bruises to the neck and left side were also noted, along with limited range of motion in all extremities. However, the patient ambulated with full weight bearing to the bathroom and back. Mrs. Bruce points to nurse's notes on November 8,

16

showing confusion and slurred speech. Other notes on November 8 show mild weakness, strong grip, no distress noted, and the neurologic comments are "Responds appropriately. Very drowsy." Dr. Holton stated that the nurses' notes were available on the computer, but admitted that she did not usually access them. This admission is one of Mrs. Bruce's linchpin arguments for malpractice.

The rehabilitation physician, Dr. Dhulipala, testified at trial and stated that Mrs. Bruce's x-rays showed no fracture, that he felt comfortable in relying upon them, and he therefore admitted her to the Health South Rehabilitation facility on November 8, 2000. He specifically stated that he did not move Mrs. Bruce's neck. Dr. Dhulipala stated that his treatment of Mrs. Bruce consisted of hot packs and ultrasound on her shoulder and neck. When that did not help, he ordered a CT scan of her cervical spine. Mrs. Bruce's niece testified by deposition that it was her own insistence and outrage over her aunt's declining condition that caused Dr. Dhulipala to finally order the CT scan on November 14, 2000.

Dr. Troy Vaughn, the neurosurgeon who performed the cervical fusion on Mrs. Bruce on November 15, after the fracture was found on November 14, 2000, testified at trial that the symptoms of a C-2 fracture range from asymptomatic to neck pain and that the most common symptom is *isolated* neck pain. He stated that after an accident and complaints of neck pain, the physician would get plain x-rays. If the x-ray is negative and the image is good, fracture can be ruled out with the regular radiograph. If fracture is still suspected, a CT scan or MRI of the neck would be next. However, he stated that it still may be difficult to recognize an occult fracture. Dr. Vaughn stated that he did not see Mrs. Bruce until after the C-2 fracture was identified on the CT scan on November 14, 2000. On that day, her main complaint was neck pain.

17

Dr. Vaughn further testified that the rotary subluxation, a ligament-type injury, and longitudinal fracture such as Mrs. Bruce's can be difficult to see on x-rays. He stated that complaints of pain, nausea, and dizziness are subjective and are not signs of neurologic deficits. He explained that neurologic deficits are objective and observable, such as weakness, sensory loss, numbness, ataxia (wobbling), and changes in reflex. He said that limited movement of the head and neck is a symptom of a fractured cervical spine. Dr. Vaughn testified that the diagnosis of Mrs. Bruce's fracture was a delayed diagnosis, but he was not sure that it was a misdiagnosis. He stated that he would probably start therapy if he had negative x-rays.

Dr. Vaughn further stated that Dr. Davis' conservative treatment of Mrs. Bruce was prudent based upon the films. He said that if the patient is confused, drowsy, and has certain neurologic findings, a CT of the head would be indicated. Dr. Vaughn further testified that Mrs. Bruce had numbness and weakness when he saw her on November 14, and that she probably had weakness initially. He stated that he did not think the delay in surgery made much difference; the increase in risk to her was very, very low because of the type of fracture that she had. He testified that when there is a lot of pain and multiple trauma from an accident, the problem can be hard to assess and difficult to diagnose. Dr. Vaughn stated that if there is a diagnosis of cervical strain, it is reasonable to stop at some point and start treating what you suspect the problem is.

Dr. Holton's expert, Dr. Gregory Allen Brian, a board certified family practitioner since 1982, served on the Medical Review Panel rendering the opinion that no physician on Mrs. Bruce's case breached the standard of care. The radiologists on the panel agreed with Dr. Mansour's reading of the x-rays and all agreed with the conclusion that no cervical fracture was indicated. Dr. Brian further

testified that the family practitioner relies on the radiologist report and that generally physicians have a large degree of comfort with the radiologist's interpretation of x-rays.

Moreover, Dr. Brian testified that, in addition to Dr. Holton, Doctors Brinkman, Davis, and Dhulipala also performed hands-on examinations of Mrs. Bruce and did not diagnose a fracture. Dr. Brian stated that Dr. Holton was not the "captain of the ship" and that Dr. Davis, as the attending physician, retained that role. The medical staff by-laws provide that the admitting physician is primarily responsible for the patient's care until discharge. In this case, Dr. Davis did the discharge summary and was the primary physician for the entire hospitalization. Notwithstanding, Dr. Brian also testified that all doctors on the case were responsible for diagnosing the injury. He also stated that Dr. Dhulipala, the physiatrist, would be more expert and held to a higher standard than Dr. Holton in diagnosing a fracture.

Dr. Brian further testified that Dr. Davis is a cardiologist and an internal medicine physician and that his care was appropriate. There was nothing incompatible with a diagnosis of cervical strain. Dr. Brian stated that people have significant symptoms for up to two weeks, and one does not get dramatic improvement with a sprain in just a few days. He stated that a physician looks for increasing pain in a shorter time frame. Here, the patient was improving but complained of head pain, so Dr. Holton ordered a CT scan of the head. That was normal, so no further studies were indicated. Dr. Holton had an appropriate diagnosis, the records and her notes indicated an improvement, and Dr. Holton had an appropriate treatment plan. As to the nurses' notes, Dr. Brian answered that it was an appropriate standard of care to scan the notes, that he did so, but that it was not essential and that he relied ninety percent (90%) on verbal reports from the nurses.

19

He also stated that the nurses' notes are voluminous, computerized, with many yes and no answers, and that instead of wading through them, a lot of doctors rely on verbal reports, *which is appropriate*.

Dr. Brian further testified that he carefully reviewed the nurses' notes in this case and did not see any red flags but did find notes *against* changing the diagnosis. He stated that, while Dr. Yarbrough said he saw weakness in the arm, there was no accompanying weakness in the grip; the notes indicated strong grip strength in both hands; and, Mrs. Bruce's weakness coordinated with her complaints of shoulder pain. Dr. Brian testified that he was comfortable with Dr. Holton's care in this case.

In the present case, the trial judge stated in her Reasons for Judgment that the case hinged upon whether the opinion of Dr. Yarbrough, Mrs. Bruce's expert, or the opinion of Dr. Brian, Dr. Holton's expert, should be accepted. The trial judge found Dr. Holton's expert, Dr. Brian, to be "far more experienced than Dr. Yarbrough in the field of family practice, having 24 years experience compared to Dr. Yarbrough's 11" and further stated that Dr. Brian's resume showed exceptional participation on medical related boards and societies and that "the factual basis for his opinion was more clearly stated."

In *Martin*, 582 So.2d 1272, the district court found that the defendant physician had breached the standard of care, and the appellate court reversed. Upon review, the Louisiana Supreme Court reversed the appellate court and reinstated the district court's judgment, stating:

> Had the appellate court fully reviewed the district court's determination that Dr. Ahmed breached the standard of care, it would have had to abide by the precept that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it

been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mutual Ins. Co.*, 558 So.2d 1106, 1112 (La.1990); *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). We have instructed the appellate courts that where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Rosell v. ESCO*, 549 So.2d at 844; *Housley* [*v. Cerise*, 579 So.2d 973 (La.1991)].

*Id*. at 1277.

While we are concerned in the present case about Dr. Holton's decision not to study the nurses' notes on the computer, expert testimony at trial established that verbal communication with the nurses is relied upon most heavily and that such reliance is appropriate. Moreover, the same nurses' notes printout that indicated severe neck pain and mild weakness on one side also indicated, on the same day, alertness and a strong grip or grasp in both hands. Indeed, in numerous instances, the nurses' notes contained positive and negative evaluations on the patient's progress on the same day since there are three shifts of nurses inputting data.

Trial testimony revealed that the incoming shift of nurses obtain detailed information from the outgoing shift, and this is why it is sometimes difficult for the patient or family to get immediate attention during shift changes. This important transfer of information takes time, and the morning nurse is expected to verbally communicate significant changes to the physician when the physician makes the morning rounds. In this case, Dr. Holton testified that no significant changes were reported to her to indicate that more tests were needed, and her own evaluations confirmed that conservative treatment of a sprain and subsequent rehabilitation were indicated.

In *Charpentier v. Lammico Ins. Co.*, 606 So.2d 83, 87 (La.App. 3 Cir. 1992), we stated as follows:

The law does not require perfection in medical diagnoses and treatment. On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. *Broadway v. St. Paul Insurance Co.*, 582 So.2d 1368 (La.App. 2d Cir. 1991), and the cases cited therein. When the alleged negligence of a specialist is at issue, only those qualified in that specialty may offer expert testimony and evidence of the applicable standard of care. *Fox v. Our Lady of Lourdes Regional Medical Center*, 550 So.2d 379 (La.App. 3rd Cir. 1989), *writs denied*, 556 So.2d 1263 and 556 So.2d 1264 (La.1990). When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be granted great deference. It is the sole province of the factfinder to evaluate the credibility of such experts and their testimony. *Arceneaux*, [365 So.2d 1330]; *Broadway*, [582 So.2d 1368].

*Charpentier*, 606 So.2d at 87.

Accordingly, a thorough review of the record in this case reveals that the factual conclusions of the trial court are reasonable and not manifestly erroneous. Based upon the evidence and testimony presented at trial, the conclusion that Dr. Holton did not deviate from the applicable standard of care is not clearly wrong. In such situations, we are bound to defer to the factfinder's view of the evidence and to affirm its judgment.

IV.

### CONCLUSION

For the above and foregoing reasons, the denial of Dr. Holton's exception of prescription and res judicata is affirmed, and the trial court's judgment on the merits in favor of Dr. Holton is also affirmed. The costs of this appeal are assessed against the plaintiff, Allie Mae Bruce.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules—Courts of Appeal.